UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Guy I. Greene,                                    File No. 19-cv-533 (ECT/TNL)

        Plaintiff,

v.

Tara Osborne-Leivian; Kevin Moser; Paul
Mayfield; Courtney Menten; Brian
Ninneman; Staci Bovin; Jana Brister-Korby;          **OPINION AND ORDER**
Paul Schnell; Nancy Johnston; Andrea
Long; Jodi Harpstead; Ann Linkert; Nicole
Vaneo; Traci Zuk; MSOP Jane Doe Nurse
Practitioner; John Doe, Minnesota
Department of Corrections–OSI; Brent
Schmidt, Minnesota Department of
Corrections, Parole Agent; Zach Gahm,
Minnesota Department of Corrections,
Hearings and Release Officer; Rebecca
Holmes-Larson, Minnesota Department of
Corrections, Executive; Vicki Janssen,
MCF-Rush City Warden; Jessica Olson,
MCF-Rush City Health Services
Administrator; M. Saari, MCF-Rush City
Behavioral Health Supervisor; Dr. Scherer,
MCF-Rush City Clinical Staff; Jenna
Younkers, MCF-Rush City Clinical Staff;
Tom Soles, MCF-Rush City Clinical Staff;
Joshua Kendall, MCF-Rush City Case
Manager; John Doe, MCF-Rush City Case
Manager; John Doe, Parole Agent, Carlton
County; John Doe, HRU Officer, sued in
their individual and official capacities,

        Defendants.

---

Guy I. Greene, *pro se*.

James R. Andreen and Samantha R. Alsadi, Erstad & Riemer, P.A., Minneapolis, MN, for Defendant Brent Schmidt.

Anthony R. Noss, Minnesota Attorney General's Office, St. Paul, MN, for the Moving State Defendants.[1]

---

Pro se Plaintiff Guy I. Greene is civilly committed to the Minnesota Sex Offender Program ("MSOP").  He brought this case under 42 U.S.C. § 1983 against Defendants—employees of MSOP and the Minnesota Department of Corrections and other state and county officials—in their individual and official capacities alleging that they deprived him of his constitutional rights in various ways in connection with his confinement.  Greene seeks declaratory and injunctive relief as well as compensatory and punitive damages. Greene's second amended complaint, *see* ECF No. 16-1, the operative complaint in this case, was screened previously in accordance with 28 U.S.C. § 1915(e)(2)(B), and a number of his claims were dismissed at that time, *see* May 21, 2020 Order Accepting R&R at 7–8

---

[1]     As described by the Minnesota Attorney General's Office, the "Moving State Defendants" are: Samantha Sheeran (to the extent Greene means Sheeran when he refers to "Dr. Scherer" in the second amended complaint), Zach Gahm, Rebecca Holmes-Larson, Tara Osborne-Leivian, Courtney Menten, Jana Brister-Korby, Nicole Vaneo ("Nicole Hawkins"), Staci Bovin, Paul Mayfield, Michelle Saari ("M. Saari"), Andrea Long, and Jenna Younkers ("Jenna Fahland") in their individual and official capacities as well as Minnesota Department of Corrections-OSI John Doe ("OSI Doe"), Jodi Harpstead, Nancy Johnston, Traci Zuk, Kevin Moser, MSOP Jane Doe Nurse Practitioner, Dr. Scherer, and John Doe HRU officer ("HRU Doe") (to the extent he is a State of Minnesota employee) in their official capacities only.  State Defs.' Mot. to Dismiss at n.1 [ECF No. 71].  Vaneo and Younkers changed their names after this action commenced and will be referred to in this opinion by their current legal names.  The Minnesota Attorney General's Office "has not, and is not at this time, appearing in this matter on behalf [of] Defendants Harpstead, Johnston, Moser, Zuk, MSOP Jane Doe Nurse Practitioner, HRU Doe, and OSI Doe in their individual capacities" but notes that "any remaining individual-capacity claims" may be dismissed *sua sponte*.  State Defs.' Mem. in Supp. at 11 n.11 [ECF No. 72].

[ECF No. 62].  Defendant Brent Schmidt, a county probation officer, and the remaining State Defendants have filed motions to dismiss Greene's remaining claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), *see* Schmidt Mot. to Dismiss [ECF No. 55]; State Defs.' Mot. to Dismiss [ECF No. 71], and their motions will be granted.

I[2]

A

Greene's first set of allegations concern his transfer from MSOP's general population to its Behavioral Therapy Unit ("BTU").  In October 2017, Greene filed a complaint against Defendant Nicole Hawkins with Defendant Tara Osborne-Leivian.  Sec. Am. Compl. ¶ 34.  A few days after Greene submitted the complaint, Osborne-Leivian "arbitrarily authoriz[ed] an administrative transfer to the [BTU] and filed a disciplinary report," allegedly in retaliation for Greene's complaint.  *Id.* ¶ 35.  Greene "did not receive advance notice of any rule violations" or "a written statement by the disciplinary committee" and "was not afforded a right to call witnesses in regards to his arbitrary placement."  *Id.* ¶ 36.  According to Greene, Osborne-Leivian used a "minor disciplinary offense" as a reason to "punitively detain him for long periods of time in the BTU."  *Id.* Greene was later informed that he had violated MSOP's rules and a disciplinary hearing

---

[2]    The lengthy procedural history of this case has been described previously and will not be repeated.  *See* March 6, 2020 R&R at 2–8 [ECF No. 29].  In analyzing a facial challenge to subject-matter jurisdiction or a Rule 12(b)(6) motion to dismiss for failure to state a claim, all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff.  *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990).  In accord with these rules, the relevant facts are drawn from Greene's second amended complaint and are accepted as true.

was held.  *See id.* ¶ 37.  Osborne-Leivian "sat at the disciplinary hearing as a judge when she was also the author of the disciplinary report."  *Id.*  "After the disciplinary panel found [Greene] guilty of rule infractions, [he] was forced to be punitively detained in the BTU [] without a clinical discharge plan."  *Id.* ¶ 38.

Greene subsequently requested a meeting with Osborne-Leivian regarding his placement in the BTU.  *Id.* ¶ 41.  At the meeting, Greene "apologized about the nature and content of the complaint" he filed against Hawkins.  *Id.* ¶ 42.  According to Greene, Osborne-Leivian "started playing the victim role and asked [Greene] 'why me.'"  *Id.* ¶ 43.  Greene "explained that she was [Hawkins's] supervisor" and was "responsible for her training and misconduct."  *Id.*  Osborne-Leivian then "became very loud and belligerent" and told Greene that he would spend further time in the BTU if he pursued litigation against MSOP.  *Id.* ¶ 44.  Greene alleges that, after his transfer to the BTU, Osborne-Leivian, Hawkins, and Defendants Nancy Johnston, Kevin Moser, Jana Brister-Korby, Stacy Bovin, and Paul Mayfield "remain[ed] deliberate[ly] indifferent to [his] punitive mistreatment, punitive isolation, and denial of minimal training . . . for over [the] last two years and did nothing to intervene."  *Id.* ¶ 45; *see id.* ¶ 68.

B

Greene's next set of allegations pertain to the revocation of his supervised release in a prior criminal case, resulting in his transfer from MSOP to a state correctional facility in Rush City, Minnesota ("MCF-Rush City").  Greene alleges that, after he was placed in the BTU, he was seen by Dr. Kendi Mustafa, who "prescribed [an] order for care, treatment and [a] written plan for the lawful transition off the behavioral unit into the conventional

MSOP treatment units." *Id.* ¶ 49.  According to Greene, despite being "on notice" to create a plan to discharge him from the BTU, "MSOP Defendants and parole agents were laying in the weeds to trump up a parole violation." *Id.* ¶ 51.  Greene alleges that "[a]ll parole violation charges were filed without notice or due process of law." *Id.*

Greene references two "parole violations" in his complaint. *Id.* ¶ 52.  Greene's supervised release was first revoked on June 26, 2018, for 90 days "following violations of failing to refrain from use o[r] possession of intoxicants/drug paraphernalia, specifically alcohol[,] and failure to comply with sex offender programming as established by the clinical director of MSOP."  Schmidt Aff., Ex. 2 at 3 [ECF No. 58-2].[3]  Greene alleges that

---

[3]      Defendant Brent Schmidt filed several documents in support of his motion to dismiss, including copies of a form listing the conditions of Greene's release to MSOP signed by Greene, a supervised release violation report prepared by Schmidt, a written decision following Greene's April 2019 revocation hearing, and Minnesota Department of Corrections Policy 106.114 governing revocation hearings. Schmidt Aff., Exs. 1–4 [ECF Nos. 58-1–58-4].  Ordinarily, courts do not consider matters outside the pleadings in resolving a facial challenge to subject-matter jurisdiction or a Rule 12(b)(6) motion to dismiss, *see* Fed. R. Civ. P. 12(d); *Osborn*, 918 F.2d at 729 n.6, but documents that are necessarily embraced by the pleadings may be considered without transforming the motion into one for summary judgment, *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003) (citation omitted).  "In general, materials embraced by the complaint include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (internal quotation marks and citation omitted). Courts "additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned." *Id.* (internal quotation marks and citations omitted).  Greene refers to the conditions of his release to MSOP and alleges the contents of the violation report and decision to revoke his supervised release in his complaint. *See* Sec. Am. Compl. ¶¶ 51– 59.  Greene does not allege the contents of Minnesota Department of Corrections Policy 106.114 in his complaint, but it is a public document.  Greene objects to the consideration of Schmidt's affidavit on the ground that Schmidt uses the term "victim" in reference to the redaction of the name of a vulnerable adult from exhibits 2 and 3 with whom Greene

Defendant John Doe, a Carlton County Parole Agent ("Carlton County Doe"), "did not communicate any parole plan" or "inform[] [him] of his rights in the parole plan" and that Defendant HRU Doe, an officer in the Hearings and Release Unit, found him guilty of violating "a parole plan that did not exist." Sec. Am. Compl. ¶ 53.

Greene was released back to MSOP from MCF-Rush City on September 24, 2018. Schmidt Aff., Ex. 2 at 3. On the day of his release, Greene signed a form listing the general and special conditions of his release to MSOP but added a handwritten notation stating, "I agree to no treatment." *Id.*, Ex. 1 at 2. Defendant Brent Schmidt, a Sherburne County probation officer assigned to Greene's case, also signed the form. *Id.* Greene alleges that his right to due process was violated because he was not given notice that his case was reassigned to Schmidt and that Schmidt "never concerned himself with his job to communicate with [Greene] about the conditions of his parole, treatment concerns or public safety." Sec. Am. Compl. ¶ 63.

On April 9, 2019, Schmidt filed a report that charged Greene with three new supervised release violations and recommended revocation. Schmidt Aff., Ex. 2. Greene alleges that Brister-Korby, Bovin, Hawkins, Mayfield, and Defendants Courtney Menten and OSI Doe, "trumped up false reports and treatment reports," resulting in charges that he

---

had unapproved contact. *See* Greene Aff. ¶¶ 2–5 [ECF No. 66]; *see also* Pl.'s Mem. in Opp'n to Schmidt Mot. to Dismiss at 1–2 [ECF No. 64]; Letter to Def. Counsel [ECF No. 83]. Greene does not, however, provide any reason to question the authenticity of the documents attached to Schmidt's affidavit. Those documents are necessarily embraced by the complaint and properly may be considered in adjudicating Schmidt's motion to dismiss. *See Bandy v. Comm'r of Corr.*, No. 13-cv-2209 (JRT/LIB), 2016 WL 1271469, at *1 n.1 (D. Minn. Mar. 31, 2016), *aff'd*, 683 Fed. App'x 551 (8th Cir. 2017).

violated the terms of his supervised release by "asking other clients at MSOP to pursue their civil rights in federal district court, . . . not participat[ing] 100 percent in treatment, allegedly threaten[ing] staff and contacting a vulnerable adult." Sec. Am. Compl. ¶¶ 51–52, 55–57; *see* Schmidt Aff., Ex. 2 at 2–3. Greene further alleges that Menten "acted out of her scope of employment by taking malicious steps to write a personal letter to prison authorities . . . based on hearsay comments made during [his] mental health meetings with . . . Bovin" and that Menten "conspired with [Bovin] to create a way to cause a parole violation rather than concern themselves with [his] treatment and rehabilitation[.]" Sec. Am. Compl. ¶¶ 64–65.

A revocation hearing was held before the Hearings and Release Unit ("HRU") of the Minnesota Department of Corrections on April 16, 2019. Schmidt Aff., Ex. 3; *see id.*, Ex. 4. Greene was represented by counsel. *Id.*, Ex. 3 at 1, 4. According to Greene, his parole agents from Carlton County and Sherburne County and OSI Doe "never concerned themselves" with his parole, his behavior, or his treatment "until the time of the parole hearing to punish him." Sec. Am. Compl. ¶¶ 54–57. Schmidt and Bovin testified at the hearing. *See* Schmidt Aff., Ex. 3 at 2. Greene alleges that Defendant Zach Gahm, the hearing officer, "did not allow [him] to receive notice of violating facility rules[] and the parole plan" but nonetheless found him guilty of the alleged violations at the hearing. Sec. Am. Compl. ¶¶ 54–57; *see* Schmidt Aff., Ex. 3 at 6. The HRU revoked Greene's supervised release and Greene was returned to MCF-Rush City for 365 days. Schmidt Aff., Ex. 3 at 1. Greene alleges that Defendants "worked in direct concert to deprive [him of] his civil right to liberty and due process of law by maliciously and callously taking away a

year [of his life] to be punitively detained . . . without treatment" at MCF-Rush City.  Sec. Am. Compl. ¶ 60; *see id.* ¶ 62.

Greene attempted to appeal the HRU's decision to Defendant Rebecca Holmes-Larson, "the Executive Hearings and Release officer," but did not receive a response. *Id.* ¶ 58.  Greene also asked Holmes-Larson "to amend the sex offender treatment special conditions because he is not incarcerated for a sex crime and . . . MSOP was using the treatment scheme to trump up parole violations for not participating 100 percent." *Id.* ¶ 59.[4]

C

Greene's third set of allegations concern a failure to protect him and deliberate indifference to his mental health during his imprisonment at MCF-Rush City.  Greene alleges generally that Defendants did not "concern themselves with the so-called need for sex offender treatment offered at" MCF-Rush City.  *Id.* ¶ 62.  Green alleges that when he arrived at MCF-Rush City he spoke with Defendants Andrea Long, the "Behavioral Therapist Director," and Dr. Scherer, a behavioral therapist, about "protecting him in the [Special Living Services ("SLS")] program[,] but they lied to [him] and did not place him in the SLS program as they promised." *Id.* ¶¶ 20–21, 72; *see id.* at 21 ¶ C.2.  Greene was "subsequently attacked by another inmate because of his arbitrary label and stigma from MSOP," and they "did nothing to stop the foreseeable harm." *Id.* ¶ 72.  When Greene attempted to send a complaint with concerns about his mental health to Long, Defendant

---

[4]     Greene does not allege whether Holmes-Larson responded to that request.

Jenna Fahland, a behavioral therapist, reportedly "intercepted the complaint[,] scratched out [Long's] name and responded to [it]." *Id.* ¶¶ 22, 89. Greene alleges that Defendant M. Saari, the "Psychological Services Director," "worked in direct concert" to "frustrat[e] and imped[e] the facility communication/kite/grievance system" and "intentionally interfered with [his] right to due process and adequate mental health care at MCF-Rush City." *Id.* ¶¶ 19, 88–89. Greene submitted "repeated sick call requests, mental health concerns and complaints to those individuals responsible for the matter," such as Saari, but Defendants "refuse[d] to properly treat and diagnose" him. *Id.* ¶¶ 90–92. Greene alleges that he was "in a great deal of mental, emotional, and psychological peril" and could not "properly think well under the misdiagnosis, severe stress and pressure[.]" *Id.* ¶ 93.

D

Greene also identifies a number of other allegedly unlawful acts related to miscellaneous aspects of his confinement at MSOP. According to Greene, MSOP Defendants are retaliating against him "because he was involved in an assault against one of their fellow employees" and because he has complained about the conditions of his confinement and lack of release from MSOP. *Id.* ¶¶ 68–69. Greene alleges, for example, that when he returned to MSOP after serving time at MCF-Rush City, "unknown MSOP Defendants continued to detain [him] in the BTU without cause or provocation while other clients who were sent to prison . . . were allowed to return back to general population . . . suggest[ing] that [D]efendants had ulterior motives to deprive [him of] his right to liberty

9

and right to receive minimal training."[5] *Id.* ¶¶ 39, 47.  When Greene applied for a discharge from MSOP, "the state court forensic examiner Dr. Robert Rediel [sic] opined that [he] would be retaliated against [by] Moose Lake staff and . . . it would be best to transfer [him] to the Community Preparation Services ('CPS') at the St. Peter MSOP site."  *Id.* ¶ 48. Defendants did not do so and did not "protect [Greene] from future harm."  *Id.*  Greene also alleges that Osborne-Leivian refused to allow him to take a polygraph test due to pending criminal charges against him despite previously granting him "permission to advance in his treatment progression to Phase II of the MSOP program."  *Id.* ¶ 46.

Greene further alleges that rather than following MSOP's Behavioral Expectations Report system, MSOP staff "falsif[ied] and exaggerate[d] behavioral reports to punish him rather than concerning themselves with treatment concerns."  *Id.* ¶¶ 74–76.  For example, after he confided in Bovin, his therapist, what he believed to be "gross deficiencies in the MSOP program," she "conspire[d] to deprive [him of] his rights by arbitrarily writing chart reports against him" rather than treating him.  *Id.* ¶ 70.  And when Greene applied for release from civil commitment through the Special Review Board, MSOP staff "conjured up a false report without due process of law and claimed [he] was in violation of facility rules by masturbating or exposing himself to MSOP employee[s]."  *Id.* ¶ 77.

---

[5]     This allegation presumably relates to Greene's treatment when he returned to MSOP after serving 90 days for his first supervised release revocation because Greene was still incarcerated at MCF-Rush City on his second revocation when he filed his second amended complaint on January 30, 2020.  In that complaint, Greene states that he was scheduled to be released from MCF-Rush City on April 27, 2020.  Sec. Am. Compl. ¶ 95.

Greene also alleges that "[i]n some instances[,] MSOP defendants intentionally placed [him] in [a] zone of danger to face seriously bodily harm and the threat of death by housing [him] with those who threaten to kill or harm him." *Id.* ¶ 71. Additionally, he states that "Defendants unknown to [him] took many adverse actions against him by denying him minimal training and his right to be rehabilitated and released from MSOP." *Id.* ¶ 73.

## II

One matter must be addressed before turning to Defendants' motions to dismiss. In his briefing in response to Defendants' motions, Greene renews his previous request that counsel be appointed to represent him in this action. "A pro se litigant has no statutory or constitutional right to have counsel appointed in a civil case." *Stevens v. Redwing*, 146 F.3d 538, 546 (8th Cir. 1998). A district court has discretion to appoint counsel in civil cases. *See Nelson v. Redfield Lithograph Printing*, 728 F.2d 1003, 1004 (8th Cir. 1984). "The relevant criteria for determining whether counsel should be appointed include the factual complexity of the issues, the ability of the indigent person to investigate the facts, the existence of conflicting testimony, the ability of the indigent person to present the claims, and the complexity of the legal arguments." *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006). Greene argues that these factors justify appointing counsel in his case. Pl.'s Mem. in Opp'n to Schmidt Mot. to Dismiss at 2–3[6]; Pl.'s Mem. in Opp'n to

---

[6] Greene's filing is titled "Plaintiff's Motion to Object to Defendant Brent Schmidt's Motion to Dismiss" but is, in substance, a response memorandum.

State Defs.' Mot. to Dismiss at 2, 17–18 [ECF No. 80][7].  Greene further argues that counsel "is needed to identify new defendants, investigate new defendants and re-file another amended complaint to include these defendants, and refile another TRO and Preliminary Injunction."  Pl.'s Surreply Mem. in Opp'n to Schmidt Mot. to Dismiss at 3 [ECF No. 78]; Pl.'s Mem. in Opp'n to Schmidt Mot. to Dismiss at 13.

Counsel will not be appointed to represent Greene.  Greene has demonstrated a threshold ability to present his claims and argue his positions, not only in this case but also in previous litigation.[8]  Neither the factual allegations in the second amended complaint nor the legal issues presented by Defendants' motions to dismiss are so complex as to warrant the appointment of counsel.  Greene's assertion that counsel is necessary to assist him in identifying new defendants and claims and filing another amended complaint also does not justify granting his request.  Greene has already received three opportunities to plead his claims and will not be given another opportunity to do so.  Greene has been informed of the pleading requirements on multiple occasions and warned that he will not

---

[7]    Like his response to Schmidt's motion, Greene's filing is titled "Plaintiff's Motion to Object to Defendant's Motion to Dismiss the Second Amended Complaint" but is, in substance, a response memorandum.

[8]    Greene is a frequent litigant in this Court.  *See, e.g.*, *Greene v. Osborne-Leivian*, No. 19-cv-831 (PJS/HB); *Greene v. Osborne-Leivian*, No. 18-cv-1677 (PJS/KMM); *Larson v. Lake*, No. 17-cv-3551 (NEB/ECW); *Tallman v. Piper*, No. 16-cv-653 (DWF/TNL); *Greene v. Ninneman*, No. 14-cv-3458 (JRT/TNL); *Greene v. Benson*, No. 11-cv-979 (JRT/TNL); *see also, e.g.*, *Giishig v. Sebelius*, No. 10-cv-3607 (MJD/AJB); *Giishig v. Hanners*, No. 10-cv-546 (MJD/AJB); *Giishig v. James*, No. 09-cv-3647 (MJD/AJB); *Giishig v. James*, No. 09-cv-2489 (MJD/AJB); *Giishig v. Sherburne Cnty. Soc. Servs.*, No. 09-cv-2442 (MJD/AJB); *O'Donnell v. Ludeman*, No. 07-cv-4887 (JRT/RLE); *Giishig v. Anderson*, No. 04-cv-4783 (MJD/AJB); *Giishig v. Neyssen*, No. 03-cv-3332 (MJD/AJB); *Giishig v. Minn. Dep't of Corr.*, No. 03-cv-3258 (MJD/AJB).

be permitted to amend his complaint to bring claims unrelated to those previously asserted. *See* March 6, 2020 R&R at 8.

### III

The Parties have expressed some uncertainty as to whether certain claims survived following the May 21, 2020 order. With respect to the meet-and-confer requirement set forth in Local Rule 7.1(a), the State Defendants represent that Greene "indicated that he agrees to dismiss any claims against Defendants Zuk and MSOP Jane Doe Nurse Practitioner to the extent all such claims against them have not already been dismissed" as well as "any state law claims to the extent they have not already been dismissed." ECF No. 73. The State Defendants note that Greene "has not yet filed a notice of voluntary dismissal" and therefore do not treat those potential claims as dismissed in their briefing. *Id.*; *see* State Defs.' Mem. in Supp. at 2 n.2, 10–12. In his response memorandum, Greene makes no mention of Zuk or MSOP Jane Doe Nurse Practitioner but seemingly indicates that it is his belief that all state-law claims against Defendants were dismissed by the prior order. *See* Pl.'s Mem. in Opp'n to State Defs.' Mot. to Dismiss at 1.

Greene's only allegations against Zuk and MSOP Jane Doe Nurse Practitioner pertain to his claim for deliberate indifference to his Crohn's disease. *See* Sec. Am. Compl. ¶¶ 80–81. That claim was previously dismissed, *see* May 21, 2020 Order Accepting R&R at 7 ¶ 6, and therefore no claims against Zuk or MSOP Jane Doe Nurse Practitioner remain. Likewise, Greene's state-law claims for negligence and medical malpractice, *see* Sec. Am. Compl. ¶¶ 100, 104, and at 17–18 ¶ 1, were previously dismissed, *see* May 21, 2020 Order Accepting R&R at 8 ¶¶ 9–10.

In the "Relief Requested" section of his second amended complaint, Greene states that Defendants committed several additional state-law torts: tortious interference with a contractual relationship, negligent hiring and credentialing, false light, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress. Sec. Am. Compl. at 18–20 ¶¶ 3, 5–9. Assuming Greene still intends to assert such claims, there are several reasons to dismiss them. First, "[t]he Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials" in their official capacities, "regardless of the remedy sought." *Cooper v. St. Cloud State Univ.*, 226 F.3d 964, 968 (8th Cir. 2000). Next, Minnesota law does not recognize the tort of false light publicity. *See Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 235 (Minn. 1998). Finally, presuming the existence of supplemental jurisdiction over state-law claims brought against Defendants in their individual capacities, Greene has not pleaded facts alleging the elements of the other five claims. *See Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015) (listing elements of tortious interference with contract claim); *Johnson v. Peterson*, 734 N.W.2d 275, 277–78 (Minn. Ct. App. 2007) (negligent hiring claim); *Blaz v. Molin Concrete Prods. Co.*, 244 N.W.2d 277, 279 (Minn. 1976) (false imprisonment claim); *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (intentional infliction of emotional distress claim); *Engler v. Illinois Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005) (negligent infliction of emotional distress claim). Any remaining state-law claims will therefore be dismissed.

The State Defendants also note that all claims against Harpstead, Johnston, and Moser "may have" been dismissed by the prior order. State Defs.' Mem in Supp. at 11

n.11.  Greene's failure-to-train claim against those Defendants, *see* Sec. Am. Compl. ¶ 66, was previously dismissed, *see* May 21, 2020 Order Accepting R&R at 7 ¶ 5.  To the extent that Greene intended to assert other constitutional claims against Harpstead and Johnston in paragraphs 101 and 103, any such claims also were dismissed in the prior order because Greene has not pleaded facts showing their personal involvement in any of the purported constitutional violations.  *See* May 21, 2020 Order Accepting R&R at 8 ¶ 11; March 6, 2020 R&R at 25.  Though not expressly identified in the prior order, Greene's allegation in paragraph 45 that Johnston and Moser, among others, "remain[ed] deliberate[ly] indifferent to the punitive mistreatment, punitive isolation, and denial of minimal training of plaintiff for over [the] last two years and did nothing to intervene" is insufficient to sustain a § 1983 claim for the same reason.  *See Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014).  Accordingly, no claims remain against Harpstead, Johnston, and Moser.

Based on the prior rulings in this case and the above determinations, the following claims remain for consideration: retaliation and deprivation of liberty and due process against Osborne-Leivian, Mayfield, Menten, Bovin, Brister-Korby, Hawkins, OSI Doe, Schmidt, Gahm, Holmes-Larson, Carlton County Doe, and HRU Doe; failure to protect against Long and Dr. Scherer; and deliberate indifference to Greene's mental health against Saari and Fahland.[9]

---

[9]      In his response to the State Defendants' motion to dismiss, Greene makes a number of new allegations not contained in his second amended complaint.  In deciding the State Defendants' motion to dismiss, only Greene's second amended complaint and documents embraced by it may be considered.  Accordingly, new allegations in Greene's briefing not contained in his second amended complaint will not be considered.  Though Greene mentions amending his complaint as an argument in support of his request for appointment

IV

A

Turning to Defendants' motions to dismiss, the State Defendants first argue that subject-matter jurisdiction does not exist over any claims for damages against them in their official capacities. State Defs.' Mem. in Supp. at 9–10. The Eleventh Amendment bars claims for damages against state employees in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999). This is because "[a] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (citing *Graham,* 473 U.S. at 165); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (explaining that a suit against a state official in his or her official capacity "is no different from a suit against the State itself"). Here, Greene seeks compensatory and punitive damages from Defendants in amounts ranging from $500,000 to $1,000,000. Sec. Am. Compl. at 21–23. To the extent Greene seeks monetary

---

of counsel, he has not filed a motion to amend his complaint and the Court does not construe the inclusion of new allegations in his briefing as a request for leave to amend (though, if it were, such a request would not be granted). Greene also has submitted an affidavit and five exhibits, including an excerpt from the "MSOP Program Theory Manual"; an expert report filed in a different case; progress notes of his treatment at MSOP from February 2018 and January 2019, some of which are signed by Brister-Korby and Bovin; an article titled "Control Unit Prisons"; and a 2017 report prepared by psychologist Dr. Robert G. Riedel for the Supreme Court Appeal Panel as part of proceedings to determine whether Greene should be discharged from MSOP. Greene Aff., Exs. A–E [ECF Nos. 81-1–81-5]. Greene's second amended complaint contains allegations concerning his treatment reports and Dr. Riedel's report and no party has questioned their authenticity. Therefore, they may be properly considered in connection with the State Defendants' motion. However, Greene does not allege the contents of the other three documents and therefore they will not be considered.

damages from the State Defendants in their official capacities, his claims are barred by the Eleventh Amendment.

Greene's official-capacity claims against the State Defendants pertaining to anything other than his confinement at MSOP—namely, the revocation of his supervised release and his imprisonment at MCF-Rush City—also must be dismissed because Greene has not alleged facts showing that he has Article III standing to seek prospective relief as to those claims.[10]  Under the doctrine established in *Ex parte Young*, 209 U.S. 123 (1908), "state officials may be sued in their official capacities for prospective injunctive relief when the plaintiff alleges that the officials are acting in violation of the Constitution or federal law." *Mo. Child Care Ass'n v. Cross*, 294 F.3d 1034, 1037 (8th Cir. 2002) (citing *Ex parte Young*, 209 U.S. at 159–60); *see Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) ("In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." (cleaned up)).

To plead proper official-capacity claims, Greene must allege facts showing that he meets the jurisdictional standing requirements imposed by Article III, § 2 of the United States Constitution. *See City of L. A. v. Lyons*, 461 U.S. 95, 101 (1983).  Article III standing requires a plaintiff to show (1) he or she suffered an injury-in-fact, (2) a causal connection

---

[10]     The State Defendants did not raise this issue in their briefing.  However, Article III standing "is a jurisdictional prerequisite and thus a threshold issue that [a court is] obligated to scrutinize, sua sponte if need be." *Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016) (internal quotation marks and citation omitted).

between the injury and the conduct complained of, and (3) that the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury-in-fact is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citations and internal quotation marks omitted). When a plaintiff seeks injunctive relief, "the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." *Park v. Forest Serv.*, 205 F.3d 1034, 1037 (8th Cir. 2000); *see Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1119 (8th Cir. 2007) ("Standing to seek injunctive relief requires a plaintiff . . . to show a likelihood of a future injury."); *Lyons*, 461 U.S. at 105, 107 n.8 (stating that a plaintiff must show a "real and immediate threat" of future injury). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *see Lyons*, 461 U.S. at 105. To show he has standing to maintain his official-capacity claims, then, Greene must allege facts plausibly showing that he faces a threat of ongoing harm or a likelihood of future injury. Greene is no longer incarcerated at MCF-Rush City. *See* Sec. Am. Compl. ¶ 95; State Defs.' Mem. in Supp. at 13 n.12; Minnesota Department of Corrections, *Find an Offender*, https://coms.doc.state.mn.us/PublicViewer/Home/Index (last visited March 12, 2021). The injuries Greene alleges he suffered from the prosecution and adjudication of his supervised release violations and during his imprisonment at MCF-Rush City are not ongoing, and Green alleges no facts suggesting that he faces a real or

immediate threat that his rights will be violated by the State Defendants at MCF-Rush City or through future revocation proceedings.[11]

B

Schmidt and three of the State Defendants—Gahm, Holmes-Larson, and HRU Doe—next argue that Greene's remaining claims against them, which pertain to the revocation of his supervised release, must be dismissed because they are immune from suit under the doctrine of quasi-judicial immunity.  Schmidt Mem. in Supp. at 6–7 [ECF No. 57]; State Defs.' Mem. in Supp. at 14; State Defs.' Reply Mem. at 11 [ECF No. 85].  Greene concedes that Schmidt may be entitled to absolute immunity and, like Schmidt, characterizes Schmidt's role in his supervised release revocations as one of a "prosecutor."  Pl.'s Mem. in Opp'n to Schmidt Mot. to Dismiss ¶ 15 and p. 13; Pl.'s Surreply to Schmidt

---

[11]   Greene's request for declaratory relief does not alter this conclusion.  When "[t]here is no claimed continuing violation of federal law" or any threat of a future violation, "the award of a declaratory judgment . . . would be useful in resolving the dispute over the past lawfulness of [a defendant's] action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed.  But the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment."  *Green v. Mansour*, 474 U.S. 64, 73 (1985).  If a plaintiff does not intend to make such a claim in later state proceedings, "the declaratory judgment would serve no purpose whatever" in resolving a dispute over the past lawfulness of a defendant's action and is, therefore, unavailable.  *Id.* at n.2.  The declaratory relief Greene seeks is retrospective in nature and is, likewise, unavailable in this case.  *See id.*; Sec. Am. Compl. at 17–20.

19

Mot. to Dismiss at 2.[12]  Greene does not respond to this particular argument with respect to Gahm, Holmes-Larson, and HRU Doe.

Absolute judicial immunity shields judges from liability for "judicial act[s] taken within [the] court's jurisdiction." *Cleavinger v. Saxner*, 474 U.S. 193, 199 (1985).  This immunity extends to individuals who "perform functions closely associated with the judicial process." *Id.* at 200; *see also Anton v. Getty*, 78 F.3d 393, 395 (8th Cir. 1996) (quoting *Butz v. Economou*, 438 U.S. 478, 513 (1978)) (stating that quasi-judicial immunity applies to "officials who have duties that are 'functionally comparable' to those of judges").  To determine whether a defendant is entitled to quasi-judicial immunity, courts consider whether factors "characteristic of the judicial process" are present, including:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger*, 474 U.S. at 202 (citing *Butz*, 438 U.S. at 512).

"[C]ertain adjudicatory or prosecutorial functions of a probation [or parole] officer may be entitled to absolute immunity, while other functions, more administrative, supervisory, or investigative in nature, may warrant only a qualified immunity." *Ray v.*

---

[12]    Local Rule 7.1(c) does not give a responding party the opportunity to file a surreply to a movant's reply memorandum.  Greene nonetheless filed a surreply without seeking permission to do so.  Schmidt subsequently filed a letter in which he both noted that Greene's surreply was "improper" and responded to its substance.  ECF No. 79.  Although such filings are not contemplated by the rules governing dispositive motions, these documents have been reviewed in considering Schmidt's motion to dismiss.

*Pickett*, 734 F.2d 370, 372 (8th Cir. 1984); *see Figg v. Russell*, 433 F.3d 593, 599–600 (8th Cir. 2006) (comparing an officer's decision not to take a parolee into custody, which entitled the officer only to qualified immunity because it "was not a quasi-judicial function or prosecutorial decision," with the act of making recommendations to a parole board, which was sufficiently quasi-judicial to create absolute immunity).   For example, the Eighth Circuit Court of Appeals has long held that "parole officials in deciding to grant, deny, or revoke parole, perform functions comparable to those of judges" and are entitled to absolute immunity from claims based on those acts. *Evans v. Dillahunty*, 711 F.2d 828, 831 (8th Cir. 1983).   Likewise, the preparation of presentence reports is "so closely associated with the exercise of a judicial function" that the "probation officers who prepare these reports are entitled to absolute immunity." *Anton*, 78 F.3d at 396 (stating that officers who evaluate parole plans, like those who prepare presentence reports, "evaluate facts, draw legal conclusions, and make recommendations which play a significant part in a decisionmaking process"); *see, e.g.*, *Corrigan v. City of Savage*, No. 18-cv-2257 (ADM/BRT), 2019 WL 1487897, at *4–5 (D. Minn. Apr. 4, 2019), *aff'd*, 786 F. App'x 614 (8th Cir. 2019), *cert. denied*, 140 S. Ct. 2740 (2020).

"A Minnesota Department of Corrections hearing officer presiding over a revocation hearing is required to take testimony, consider and weigh evidence, make factual findings, determine appropriate sanctions, including whether to revoke the alleged offender's supervised release, and issue [] decisions that are subject to appeal." *Stevens v. Roy*, No. 16-cv-3807 (JRT/LIB), 2017 WL 8944013, at *11 (D. Minn. June 8, 2017) (citation omitted), *report and recommendation adopted*, 2017 WL 4156999 (D. Minn.

Sept. 19, 2017); *see also* Schmidt Aff., Ex. 4 (containing Minnesota Department of Corrections Policy 106.114, which prescribes the standardized procedures for proceedings before the HRU "for offenders who have been charged with violating offender discipline rules or conditions of release"). These functions are sufficient to warrant absolute immunity for actions taken within the scope of a hearing officer's duties. *Stevens*, 2017 WL 8944013, at *11; *see also Favors v. Hoover*, No. 13-cv-428 (JRT/LIB), 2016 WL 675708, at *17 (D. Minn. Jan. 29, 2016), *report and recommendation adopted*, 2016 WL 659710 (D. Minn. Feb. 18, 2016), *aff'd*, 670 Fed. App'x 434 (8th Cir. 2016); *Bandy*, 2016 WL 1271469, at *4–6 (applying the *Butz* factors). Here, Greene's allegations against HRU Doe and Gahm, the hearing officers at his two revocation hearings, arise from the performance of their duties in adjudicating whether Greene violated the conditions of his supervised release. *See* Sec. Am. Compl. ¶¶ 53–57, 102. Greene's allegations against Holmes-Larson also concern the performance of her duty as executive officer of the HRU, or lack thereof, to respond to Greene's attempted appeal of his revocation. *See id.* ¶¶ 58–59, 102. Accordingly, HRU Doe, Gahm, and Holmes-Larson are entitled to absolute quasi-judicial immunity. Greene's allegations that these Defendants found him guilty of violating his supervised release without due process and based on insufficient evidence cannot overcome this entitlement. *See Martin v. Hendren*, 127 F.3d 720, 722 (8th Cir. 1997) ("Absolute quasi-judicial immunity would afford only illusory protection if it were lost the moment an officer acted improperly.").

Whether Schmidt is entitled to absolute immunity presents a closer question. Two cases are illustrative. In *Ray v. Pickett*, the plaintiff filed suit against two federal probation

officers, alleging that they intentionally falsified a parole-violation report.  734 F.2d at 371.

The district court dismissed the plaintiff's claims on the ground that the officers were

"absolutely immune from liability because they were performing discretionary duties

within the framework of an adjudicatory process."  *Id.*   The Eighth Circuit reversed the

district court, concluding that the officers were entitled only to qualified immunity.  *Id.* at

372–75.   The court looked to "the role played by the probation officer[s] in the parole

revocation process" and concluded that, under the applicable regulations, the officers

"ha[d] no part in making the decision to initiate a parole revocation proceeding."  *Id.* at

372.   The court reasoned that "the function of a probation officer in submitting a parole

violation report" was neither "adjudicatory [n]or prosecutorial in nature."  *Id.* at 374.

Rather, much like "a police officer in deciding whether there is probable cause for an

arrest," the report only triggered an investigative process, but the probation officers were

not involved in initiating an administrative hearing or recommending sanctions.  *Id.*   In

contrast, in *Rickmyer v. Browne*, the court concluded that a probation officer was entitled

to quasi-judicial immunity from a § 1983 claim arising from reporting the plaintiff's

violations of his conditions of release and recommending revocation of his release.  No. 13-

cv-559 (SRN/LIB), 2014 WL 1607590, at *7 (D. Minn. Apr. 18, 2014), *aff'd*, 587 F. App'x

354 (8th Cir. 2014).   The court reasoned that the probation officer's actions were

sufficiently "'closely connected' to the judicial decision maker" to warrant absolute

immunity because "the purpose of [his] actions was to provide assistance, information and

recommendations . . . regarding revocation[.]" *Id.* (quoting *Figg*, 433 F.3d at 599–600, and

*Jenson v. Jorgenson*, No. Civ. 03-4200, 2005 WL 2412379, at *9 (D.S.D. Sept. 29, 2005)).

As described in Greene's second amended complaint and documents embraced by it, Schmidt's alleged actions more closely resemble those described in *Rickmyer*. Schmidt did not merely prepare a violation report. *See* Schmidt Aff., Ex. 2. He recommended that Greene's supervised release term be revoked, triggering a revocation hearing that occurred one week later. *See id.* at 4. At the hearing, Schmidt presented evidence and offered a recommendation regarding the disposition of Greene's case. *See id.*, Ex. 3 at 2–3, Ex. 4 ¶¶ C.2, C.5. And the HRU relied on Schmidt's recommendation in reaching the decision to revoke Greene's supervised release. *Id.*, Ex. 3 at 2. In total, the actions that Greene alleges Schmidt took in connection with the revocation of his supervised release were "adjudicatory or prosecutorial" in nature and so "closely associated" with the decisionmaking process of the HRU as to confer absolute immunity upon Schmidt.[13]

## C

The State Defendants seek to dismiss Greene's remaining claims for deliberate indifference to mental health, failure to protect, deprivation of liberty and due process, and retaliation under Rule 12(b)(6). In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept all the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be

---

[13]   Construing Greene's second amended complaint liberally, as required, Greene's allegations against HRU Doe, Gahm, Holmes-Larson, and Schmidt appear only to concern their involvement in the prosecution and adjudication of the supervised release violations. *See* Sec. Am. Compl. ¶¶ 53–59, 63, 102. Accordingly, all claims against these Defendants will be dismissed on this basis.

detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S at 556). Pro se complaints are to be construed liberally, but "they still must allege sufficient facts to support the claims advanced." *Stone v. Harry*, 364 F.3d 912, 914 (8th Cir. 2004) (citation omitted).

1

The State Defendants argue that Greene's "unlawful imprisonment" claim against Osborne-Leivian, Menten, Brister-Korby, Hawkins, Bovin, Mayfield, and OSI Doe arising from the revocation of his supervised release and consequent imprisonment at MCF-Rush City must be dismissed because it is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). State Defs.' Mem. in Supp. at 12–14.[14] Under *Heck*, "[a] claim is not cognizable under section 1983 where a judgment in favor of the plaintiff would necessarily imply invalidity of the plaintiff's state conviction or sentence, unless the conviction or sentence has already been invalidated." *Wilson v. Lawrence Cnty., Mo.*, 154 F.3d 757, 760 (8th Cir. 1998); *see Heck*, 512 U.S. at 486–87; *see also Wilkinson v. Dotson,* 544 U.S. 74, 82 (2005) (stating § 1983 actions are "barred (absent prior invalidation)—no matter the relief sought," and

---

[14]     Gahm, Holmes-Larson, HRU Doe, and Schmidt also raised *Heck* as an alternative basis for dismissing Greene's claims against them. *See* State Defs.' Mem. in Supp. at 12–14; Schmidt Mem. in Supp. at 12–13.

"no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—if success in that action would necessarily demonstrate the invalidity of confinement or its duration").  The Eighth Circuit has applied *Heck* in cases in which a plaintiff challenges the revocation of supervised release.  *Marlowe v. Fabian*, 676 F.3d 743, 747 (8th Cir. 2012); *see also Newmy v. Johnson*, 758 F.3d 1008, 1009–11 (8th Cir. 2014) (concluding § 1983 claim against parole officer for allegedly making a false report resulting in the revocation of his parole was barred by *Heck*).  To satisfy the so-called "favorable termination" requirement, a § 1983 plaintiff "must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.[]"  *Heck*, 512 U.S. at 486–87.  The favorable termination requirement applies even when a plaintiff is no longer incarcerated.  *Newmy*, 758 F.3d at 1010.

Although claims based on "the fact or duration of [a plaintiff's] confinement" are not cognizable under § 1983, *see Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973), a plaintiff may bring "constitutional claims that merely challenge the conditions of . . . confinement," *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).  Section 1983 claims that "do not function as collateral attacks on the judgment itself, such as a claim for 'using the wrong procedures' rather than 'reaching the wrong result,'" also are not barred by *Heck*.  *Bandy v. Comm'r of Corr.*, No. 13-cv-2209 (JRT/LIB), 2014 WL 28792, at *4 (D. Minn. Jan. 2, 2014) (quoting *Heck*, 512 U.S. at 482–83).  However, *Heck* "bars challenges to procedures that, if

invalidated, would 'necessarily demonstrate the invalidity of confinement or its duration.'"
*Favors*, 2016 WL 675708, at *10 (quoting *Wilkinson*, 544 U.S. at 82).

Greene alleges that MSOP employees and OSI Doe deprived him of his right to liberty and due process by "trump[ing] up false reports and treatment reports," that resulted in charges that he violated his supervised release and, ultimately, his revocation and imprisonment.  Sec. Am. Compl. ¶¶ 51–52, 55–56.  Greene also alleges specifically that Menten and Bovin conspired "to create a way to cause a parole violation rather than concern themselves with [his] treatment and rehabilitation" and that Menten took "malicious steps to write a personal letter to prison authorities . . . based on hearsay comments made during [his] mental health meetings with Bovin." *Id.* ¶¶ 64–65.  Greene's success on these claims would necessarily imply the invalidity of the revocation of his supervised release and his resulting sentence of imprisonment.  Greene does not allege that the revocation of his supervised release has been declared invalid or any other facts indicating an ability to satisfy the favorable termination requirement.  Therefore, this subset of Greene's claims must be dismissed.[15]  *Heck* does not, however, bar Greene from asserting claims related to the conditions of his confinement at MCF-Rush City.

---

[15]    Greene's allegations against Carlton County Doe pertain to his supervised release violations, *see* Sec. Am. Compl. ¶¶ 53, 55–57, and therefore his claims against Carlton County Doe will be dismissed for the same reason.  *See Smith v. Boyd*, 945 F.2d 1041, 1042–43 (8th Cir. 1991) (stating a court may dismiss claims *sua sponte* under Rule 12(b)(6)).

2

Greene's allegations concerning the conditions of his imprisonment at MCF-Rush City implicate two claims: deliberate indifference to his mental health, primarily as to Saari and Fahland, and failure to protect him, primarily as to Long and Dr. Scherer.  The State Defendants argue that Greene has not adequately pleaded either claim.  State Defs.' Mem. in Supp. at 16–21; State Defs.' Reply Mem. at 3–8.

a

"Prison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious mental-health-care needs."  *Vaughn v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995); *see Estelle v. Gamble*, 429 U.S. 97 (1976).  This standard includes "both an objective and a subjective component," *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000), and its application is "fact-intensive," *Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007).  To prove deliberate indifference, a plaintiff must show that (1) "he suffered from an objectively serious medical need" and (2) "prison officials actually knew of, but deliberately disregarded, that need."  *Meuir*, 487 F.3d at 1118.  A medical need is objectively serious if it either "has been diagnosed by a physician as requiring treatment" or "is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).  Deliberate disregard is "more than negligence, more even than gross negligence[.]"  *Jolly*, 205 F.3d at 1096 (quoting *Estate of Rosenberg v. Crandall*, 56 F.3d 35, 37 (8th Cir. 1995)); *see Smith v. Clarke*, 458 F.3d 720, 724 (8th Cir. 2006) ("Malpractice alone is not actionable under the [E]ighth

[A]mendment."); *Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) (stating the requisite mental state is "akin to criminal recklessness"). A plaintiff must show both that the defendant had actual knowledge that the plaintiff's medical condition created a substantial risk of serious harm and that the defendant failed to act to abate that risk. *See Coleman v. Rahija*, 114 F.3d 778, 785–86 (8th Cir. 1997); *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). "[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Jolly*, 205 F.3d at 1096 (quoting *Estate of Rosenberg*, 56 F.3d at 37); *see Dulany v. Carnahan*, 132 F.3d 1235, 1239 (8th Cir. 1997) ("As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment.").

Greene alleges broadly that Defendants did not "concern themselves with the so-called need for sex offender treatment offered at" MCF-Rush City and that they "remain[ed] deliberate[ly] indifferent to [his] mental health care in properly diagnosing and treating him." Sec. Am. Compl. ¶¶ 62, 85, 91. Greene also alleges the existence of evidence "that he suffers from Emotional and Psychological Trauma that are not properly diagnosed, such as PTSD, Childhood Trauma, Severe Depression, ADHD and episodes of Bi-polar." *Id.* ¶ 86. Additionally, he alleges that MSOP medical staff diagnosed him with "PTSD Fight or Flight syndrome, and other underlining problems from childhood trauma" and that he previously "received a prescribed order for care [and] treatment" from a doctor at MSOP. *Id.* ¶¶ 49, 87. Assuming these allegations are sufficient to plausibly plead that Greene suffered from an objectively serious medical need, he has not plausibly pleaded the

subjective prong of the deliberate-indifference standard. Greene has not alleged that either Saari or Fahland was aware of any diagnosis or treatment prescribed by MSOP staff. Although Greene alleges that Saari "is responsible for mental health care generally and for arranging specialized psychiatric care and placement" at MCF-Rush City, *id.* ¶ 92, his primary factual allegation that Saari "intentionally interfered" with his receipt of adequate mental health care does not involve Saari at all. Rather, Greene alleges that when he attempted to send a mental health concern and complaint to Long, the "Behavioral Therapist Director" at MCF-Rush City, Fahland, a behavioral therapist, intercepted the complaint and responded. *Id.* ¶¶ 88–89. No reasonable inference that either Saari or Fahland acted with deliberate disregard can be drawn from this allegation. To the contrary, the reasonable inference is that Fahland responded to his concern. Greene also alleges generally that he submitted "repeated sick call requests, mental health concerns and complaints to those individuals responsible for the matter," but that Defendants "refuse[d] to properly treat and diagnose" him. *Id.* ¶¶ 90–91. However, he does not allege any facts plausibly suggesting that Saari, Fahland, or other mental health staff at MCF-Rush City had actual knowledge of a mental health condition that was creating a substantial risk of serious harm or that they failed to act to abate such a risk. Accordingly, Greene has not pleaded a claim for deliberate indifference to his mental health while he was imprisoned at MCF-Rush City.

b

The Eighth Amendment also requires prison staff "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)

(citation omitted).  Prison officials must "take reasonable measures to guarantee the safety of inmates," *id.* at 832 (citation omitted), but not "every injury suffered by one prisoner at the hands of another" rises to the level of a constitutional violation, *id.* at 834.  To establish a failure-to-protect claim, a plaintiff "must show that the prison official was deliberately indifferent to a substantial risk of serious harm." *Whitson v. Stone Cnty. Jail*, 602 F.3d 920, 923 (8th Cir. 2010) (citation and internal quotation marks omitted).  Again, this standard requires a plaintiff to satisfy an objective requirement—that "the deprivation of rights was sufficiently serious," *i.e.*, that "the inmate is 'incarcerated under conditions posing a substantial risk of serious harm'"—and a subjective requirement—that "the prison official had a 'sufficiently culpable state of mind.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). The first prong is generally met by establishing greater than de minimis physical harm. *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008).  With respect to the second prong, "[a]n official is deliberately indifferent if he or she actually knows of a substantial risk and fails to respond reasonably." *Whitson*, 602 F.3d at 923.

Greene has not plausibly pleaded an Eighth Amendment violation based on a failure to protect him during his imprisonment at MCF-Rush City.  Greene seemingly alleges that he was at a substantial risk of serious harm while at MCF-Rush City because of "his arbitrary label and stigma from MSOP." Sec. Am. Compl. ¶ 72.  An allegation that an inmate was in danger because of his status as a sex offender is generally not sufficient to sustain a § 1983 claim. *See, e.g.*, *Lane v. Klingler*, 25 F. App'x 781, 783 (10th Cir. 2001). Greene does allege that he was attacked by another inmate as a result.  Sec. Am. Compl. ¶ 72.  However, he does not allege any facts that would support a reasonable

inference that either Long or Dr. Scherer had actual knowledge of a substantial risk of serious harm to Greene from that inmate or anyone else.  Rather, Greene's sole allegation is that he spoke with Long and Dr. Scherer when he first arrived at MCF-Rush City about "protecting him in the [SLS] program" but that they did not place him in the program.  *Id.* He does not allege, for example, that he reported any threats, that Long or Dr. Scherer received information from other sources that Greene was at a substantial risk of harm, or that they made any statements or took any actions that might indicate they perceived a risk to Greene's safety.  *See Prater v. Dahm*, 89 F.3d 538, 541–42 & n.2 (8th Cir. 1996).  In his briefing in opposition to the State Defendants' motion, Greene states that the State Defendants "knew or should have known" that there was a "serious threat to his safety" at MCF-Rush City during his imprisonment for his second supervised release violation because he "was placed in a specialized unit for his safety" during his 90-day term of imprisonment for his first supervised release violation based on a recommendation from the HRU officer.  Pl.'s Mem. in Opp'n to State Defs.' Mot. to Dismiss at 21–22.  These allegations do not appear in Greene's second amended complaint, nor would they be enough to state a claim for deliberate indifference even if they did.

3

Greene's second amended complaint may fairly be read as intending to assert due-process claims based on deprivations of his liberty during his civil commitment at MSOP. The State Defendants argue that Greene has not stated either a procedural or substantive due process claim against MSOP Defendants and OSI Doe.  State Defs.' Mem. in Supp. at 21–26; State Defs.' Reply Mem. at 8–11.

32

a

To succeed on a procedural due process claim, a plaintiff must show "(1) the existence of a constitutionally protected liberty or property interest; and (2) that the defendant deprived him of that interest without constitutionally adequate process." *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 815 (D. Minn. 2015) (citations omitted); *see Jenner v. Nikolas*, 828 F.3d 713, 716 (8th Cir. 2016) (citing *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)). If the plaintiff cannot identify any protected liberty or property interest of which he was deprived, "any procedural due process claim necessarily fails." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012); *see Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (explaining that courts do not consider what process is due unless a plaintiff has a protected liberty or property interest). "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir. 1998). "This inquiry examines 'the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)). "Relevant factors include the affected private interest, the risk of an erroneous deprivation, the probable value of additional procedural safeguards, and the government's interest, including burdens that additional safeguards would entail." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Greene alleges that he was deprived of his liberty through his placement in the BTU and the deprivation of "his right to minimal training and treatment at MSOP." *See* Sec. Am. Compl. ¶¶ 35–40, 45–47, 50, 62, 68, 73. "Neither the Supreme Court nor [the Eighth Circuit] has determined the extent to which the Constitution affords liberty interests to indefinitely committed dangerous persons under the *Mathews* balancing test." *Senty-Haugen*, 462 F.3d at 886. The liberty interests of an individual civilly committed to state custody "are considerably less than those held by members of free society," but such an individual "is entitled to 'more considerate treatment and conditions of confinement'" than a prison inmate. *Sorenson v. Minn. Dep't of Hum. Servs.*, No. 14-cv-4193 (ADM/LIB), 2015 WL 251720, at *16 (D. Minn. Jan. 20, 2015) (quoting *Senty-Haugen*, 462 F.3d at 886. Courts have looked to cases involving due process claims in the prison context for guidance in determining whether a constitutionally protected liberty interest exists in the civil commitment context. *See, e.g.*, *Sorenson*, 2015 WL 251720, at *16; *Linehan v. Johnston*, No. 18-cv-3483 (WMW/KMM), 2019 WL 6879366, at *3–4 (D. Minn. Nov. 26, 2019), *report and recommendation adopted*, 2019 WL 6873984 (D. Minn. Dec. 17, 2019); *Flores v. Moser*, No. 16-cv-1860 (ADM/KMM), 2019 WL 2016789, at *7 (D. Minn. Jan. 7, 2019). In that context, "courts determining whether an official action has deprived an inmate of a liberty interest have asked whether the action 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Flores*, 2019 WL 2016789, at *7 (quoting *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005)). Accordingly, Green must establish that his placement in the BTU "imposed a significant and unusual hardship as compared to the restraints that are an ordinary part of commitment at MSOP."

*Id.* Greene's complaint does not contain factual allegations to suggest his placement in the BTU satisfies this standard. Beyond vague allegations indicating his dissatisfaction with the treatment and training available to him, he has not alleged any facts from which it might plausibly be inferred that his placement in the BTU differs in any significant way from the ordinary conditions of civil commitment. Greene therefore has not alleged any deprivation of his liberty rising to the level of constitutional significance and cannot sustain a procedural due process claim.[16]

---

[16]     Even if Greene had alleged the existence of a constitutionally protected liberty interest, he has not alleged facts plausibly showing that he was not afforded adequate process. Greene's failure to allege a protected interest necessarily makes it difficult to assess exactly what process would be due because the two prongs of the procedural due process analysis are intertwined. Regardless, "not all deprivations of interests protected by the Fourteenth Amendment require full evidentiary hearings before impartial decision-makers," *Goff v. Dailey*, 991 F.2d 1437, 1440–41 (8th Cir. 1993), and "due process in the context of disciplinary proceedings" means "a process for challenging a decision" that is not necessarily required to occur before the discipline is imposed, *Larson v. Jesson*, 11-cv-2247 (PAM/LIB), 2018 WL 3352926, at *4 (D. Minn. July 9, 2018) (citing *Goff*, 991 F.2d at 1442). Though Greene alleges that he "did not receive advance notice of any rule violations and a written statement by the disciplinary committee," that he "was not afforded a right to call witnesses," and that Osborne-Leivian "sat at the disciplinary hearing as a judge when she was also the author of the disciplinary report," Greene also identifies procedures employed prior to his detention in the BTU, including that he was "served with violating rule infractions" and that a disciplinary hearing was held. Sec. Am. Compl. ¶¶ 36–37. Additionally, Green does not allege that he availed himself of post-deprivation grievance procedures or that those procedures are somehow inadequate. *Groenewold v. Kelley*, 888 F.3d 365, 373 (8th Cir. 2018) (stating "a plaintiff may not bring a § 1983 post-deprivation procedural due process claim without first exhausting the state's available administrative remedies" unless he "proves that such remedies were inadequate"); *Pyron v. Ludeman*, Nos. 10-cv-3759, 10-cv-4236 (PJS/JJG), 2011 WL 3293523, at *7 (D. Minn. June 6, 2011) (concluding that even if the plaintiffs had alleged a protected interest, they could not state a procedural due process claim because there is an available and adequate grievance procedure for civilly committed sex offenders (citing Minn. Stat. § 246B.03, subd. 3)), *report and recommendation adopted*, 2011 WL 3290365, at *1 (D. Minn. July 29, 2011), *aff'd sub nom.*, *Hollie v. Ludeman*, 450 F. App'x 555 (8th Cir. 2012).

b

In addition to its procedural protections, the Due Process Clause protects individual liberties from government action "regardless of the fairness of the procedures used to implement them." *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (internal quotation marks omitted).  To state a substantive due process claim against a state official, a plaintiff must demonstrate that a fundamental right was violated and that the official's conduct shocks the conscience.  *Folkerts v. City of Waverly*, 707 F.3d 975, 980 (8th Cir. 2013).  Conscience shocking conduct only includes "the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." *White v. Smith*, 696 F.3d 740, 757–58 (8th Cir. 2012) (quotation marks omitted).  "Only a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Folkerts*, 707 F.3d at 981 (cleaned up).

Greene contends that his allegations concerning his confinement at MSOP should be evaluated under a different standard established in *Youngberg v. Romeo*, 457 U.S. 307 (1982).  Pl.'s Mem. in Opp'n to State Defs.' Mot. to Dismiss at 2–3, 5–7, 15–16.  In *Youngberg*, the United States Supreme Court considered when an involuntarily committed individual's liberty interests in safe conditions of confinement and freedom from bodily restraints become so infringed as to violate due process.  *Id.* at 314–23.  The Court held that the appropriate standard for determining whether those rights have been adequately protected is whether professional judgment was exercised.  *Id.* at 321–23.  Under this standard, a decision made by a qualified professional concerning the treatment and

conditions of confinement of an involuntarily committed individual is "presumptively valid" and "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323.

*Youngberg* dealt with a challenge to the conditions of confinement, not a challenge to the commitment itself. The Eighth Circuit Court of Appeals has recently clarified the proper standards to be applied under each circumstance. *Karsjens v. Lourey*, ___ F.3d ___, No. 18-3343, 2021 WL 709565 (8th Cir. Feb. 24, 2021). When a civilly-committed plaintiff challenges the adequacy of his treatment based on the implementation of a statutory scheme—*e.g.*, "the indefinite nature of [his] confinement; the lack of automatic periodic review, [or] the administration of the treatment program"—the "shocks the conscience" standard should be applied. *Id.* at *2. However, when a plaintiff challenges the conditions of confinement within the facility as unconstitutionally punitive, the *Bell* standard applies. *Id.* at *3–4. In those cases, the court must "decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at *3 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). "Unless the detainee can show an expressed intent to punish . . . , that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to such alternative purpose." *Id.* (cleaned up). And, finally, when a

civilly committed plaintiff alleges inadequate medical care, the deliberate indifference standard applies.  *Id.*

Greene's complaint is somewhat unclear as to whether he intends to challenge the indefinite nature of his commitment to MSOP, particular conditions of his confinement, or the adequacy of his mental health treatment while in the BTU, or all of the above.  For example, Greene alleges that he has been "punitively detained in the BTU unit without a clinical discharge plan."  Sec. Am. Compl. ¶ 38.  Elsewhere, he again alleges that his placement in the BTU is "punitive."  *See id.* ¶¶ 45, 47, 68.  But he also alleges that MSOP Defendants are "deliberate[ly] indifferent to the denial of "his right to minimal training and treatment at MSOP," *id.* ¶¶ 45–47, that he has not been "provided a treatment plan to transition back to conventional treatment," *id.* ¶¶ 49–50, that he has been "forc[ed] . . . to participate in sex offender programming at MSOP" despite committing a "non-sex crime," *id.* ¶ 62, and that he has been denied "his right to be rehabilitated and released from MSOP," *id.* ¶ 73.

Regardless of what standard is applied, Greene has not stated a plausible claim.  To the extent Greene intends to challenge the administration of the MSOP program as applied to him, "the Supreme Court has not recognized a due process right to appropriate or effective or reasonable treatment of the illness or disability that triggered the patient's involuntary confinement."  *Karsjens*, 2021 WL 709565, at *2 (internal quotation marks and citations omitted).  Even assuming Greene could allege the violation of a fundamental right, he has not plausibly alleged that MSOP Defendants and OSI Doe engaged in "egregious or outrageous" conduct so severe as to amount to conscience-shocking action.

Likewise, Greene has not alleged facts plausibly showing that his placement in the BTU is punitive and, in fact, acknowledges that it was a consequence of his own behavior. *See* Sec. Am. Compl. ¶¶ 36 (noting his "minor disciplinary offense"), 38 (stating he was found guilty of "rule infractions"). Finally, if Greene intends to assert a claim based on his mental health care while in the BTU, he has not identified a treatment need with respect to which MSOP staff have been deliberately indifferent.

### 4

The State Defendants argue that Greene also has failed to state a retaliation claim in connection with his confinement at MSOP. State Defs.' Mem. in Supp. at 14–15. "To establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that he engaged in a protected activity, (2) that the defendants responded with adverse action that would chill a person of ordinary firmness from continuing in the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity." *Beaulieu*, 690 F.3d at 1025 (internal quotation marks and citations omitted). To satisfy the third element, a plaintiff must show that but for a retaliatory motive, the defendants would not have engaged in the retaliatory conduct. *Haynes v. Stephenson*, 588 F.3d 1152, 1156 (8th Cir. 2009). "Failure to satisfy any of the three elements results in the failure of the claim." *Evenstad v. Herberg*, 994 F. Supp. 2d 995, 1000 (D. Minn. 2014).

Green alleges that he engaged in protected activity by filing a complaint against Hawkins with Osborne-Leivian as well as unspecified complaints about the conditions of his confinement and "lack of release from MSOP." Sec. Am. Compl. ¶¶ 34, 68; *see*

*Evenstad*, 994 F. Supp. 2d at 1000–01.  Greene also alleges a number of adverse actions taken against him by MSOP staff.  For example, he alleges that Osborne-Leivian "arbitrarily authoriz[ed] an administrative transfer to the [BTU] and filed a disciplinary report" a few days after he filed his complaint against Hawkins and that Osborne-Leivian threatened him with spending further time in the BTU if he pursued litigation against MSOP.  *Id.* ¶¶ 35, 44.  Greene further alleges that Osborne-Leivian refused to allow him to take a polygraph test due to his pending criminal charges despite previously granting him permission "to advance in his treatment progression to Phase II of the MSOP program."  *Id.* ¶ 46.  Greene also makes allegations against unspecified individuals.  He alleges that when he returned to MSOP after serving time at MCF-Rush City, "unknown MSOP Defendants continued to detain [him] in the BTU without cause or provocation while other clients who were sent to prison . . . were allowed to return back to general population . . . suggest[ing] that [D]efendants had ulterior motives to deprive [him of] his right to liberty and right to receive minimal training."  *Id.* ¶¶ 39, 47; *see id.* ¶¶ 68, 73.

However, Greene has not plausibly pleaded the third element of a retaliation claim. The Eighth Circuit of Appeals has "consistently found the filing of a disciplinary action against an inmate, if done in retaliation for the inmate's use of the grievance procedure[,] . . . is allegation sufficient to survive dismissal at the pleading stage."  *Williams v. Horner*, 403 F. App'x 138, 140 (8th Cir. 2010) (collecting cases); *see Henderson v. Baird*, 29 F.3d 464, 469 (8th Cir. 1994) ("A prisoner has a cause of action when the prisoner alleges that prison officials filed disciplinary charges based upon false allegations against the prisoner in retaliation for the prisoner's participation in grievances against prison officials.").  But

"no claim can be stated when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform." *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990); *see Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993) ("[I]f the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail."); *see also, e.g.*, *Favors v. Hoover*, No. 13-cv-428 (JRT/LIB), 2014 WL 4954687, at *12 (D. Minn. Sept. 30, 2014) (dismissing MSOP plaintiff's retaliation claim on this basis). Greene's own allegations undercut his ability to plead that the adverse actions he describes were motivated by retaliation against his exercise of protected activity. Greene alleges that MSOP staff retaliated against him "because he was involved in an assault against one of their fellow employees" and that Osborne-Leivian withheld his treatment progress based on pending criminal charges against Greene. Sec. Am. Compl. ¶ 69. Additionally, Greene states that he was found guilty of rule infractions based on Osborne-Leivian's disciplinary report. *Id.* ¶ 38. Greene also alleges that when he applied for a discharge from MSOP, "the state court forensic examiner Dr. Robert Rediel [sic] opined that [he] would be retaliated against [by] Moose Lake staff" absent a transfer to Community Preparation Services, *id.* ¶ 48, but no such statement appears in Dr. Riedel's report, which was submitted by Greene, *see* Greene Aff. in Opp'n to State Defs.' Mot. to Dismiss, Ex. E [ECF No. 81-5]. Greene does allege that MSOP staff "falsif[ied] and exaggerate[d] behavioral reports to punish him." *Id.* ¶¶ 70, 74–77. But Greene does not tie this allegation to any particular defendant or protected activity. Accordingly, Green has not stated an actionable retaliation claim against MSOP Defendants or OSI Doe.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Defendant Brent Schmidt's Motion to Dismiss [ECF No. 55] is **GRANTED**;

2. Plaintiff's Motion to Object to Defendant Brent Schmidt's Motion to Dismiss [ECF No. 64] is **DENIED**;

3. The Moving State Defendants' Motion to Dismiss [ECF No. 71] is **GRANTED**;

4. Plaintiff's Motion to Object to Defendants' Motion to Dismiss the Second Amended Complaint [ECF No. 80] is **DENIED**;

5. Plaintiff's Motion to Appoint Counsel [ECF No. 78] is **DENIED**;

6. Greene's official-capacity claims for damages and for injunctive and declaratory relief tied to the revocation of his supervised release and imprisonment at MCF-Rush City are **DISMISSED without prejudice**; and

7. All other claims are **DISMISSED with prejudice**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  March 12, 2021                    s/ Eric C. Tostrud
                                          Eric C. Tostrud
                                          United States District Court